UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :

   - v. –                                   :        S6 11 Cr. 111 (NRB)

ALWAR POURYAN,                    :

                                     :
           Defendant.
                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**GOVERNMENT'S SENTENCING MEMORANDUM**

                                                           PREET BHARARA
                                                           United States Attorney for the
                                                           Southern District of New York
                                                           Attorney for the United States of America

CHRISTIAN EVERDELL
AIMEE HECTOR
GLEN KOPP

Assistant United States Attorneys
    - Of Counsel -

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| - v. – : | S6 10 Cr. 162 (KMW) |
| ALWAR POURYAN, : | |
| Defendant. : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## I. PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of Alwar Pouryan, which is scheduled for September 25, 2013, at 3:00 p.m., and in response to Pouryan's sentencing letter of September 16, 2013 ("Deft. Sent. Ltr."). On April 15, 2013, following a nine-day bench trial, Your Honor found Pouryan guilty of one count of providing material support to terrorists, namely, the Taliban; and of one count of conspiring to acquire and transfer surface-to-air missiles. The missiles were intended to be supplied to purported representatives of the Taliban to kill American soldiers in Afghanistan. The applicable Guidelines sentence for the defendant's crimes is life imprisonment, and conviction for the conspiracy to transfer surface-to-air missiles carries a twenty-five year mandatory minimum sentence. As set forth below, the nature, circumstances, and seriousness of Pouryan's crimes and Pouryan's plainly perjurious statements on the witness stand call for a lengthy sentence consistent with the applicable Guidelines range. The Government recognizes, however, that a sentence of less than life could be sufficient to meet the goals of sentencing under Title 18, United States Code, Section 3553(a).

## II. CRIMINAL CONDUCT

A. **Pouryan and Orbach's Early Weapons Trafficking**

Pouryan and his co-defendant, Oded Orbach, trafficked in weapons months before they conspired to arm the Taliban in late 2010 – the conduct for which they were convicted. In April 2010, Pouryan received an inquiry from his future father-in-law, Hassan Chokr. Chokr asked if Pouryan could fulfill an order from an embargoed African country for weapons, including automatic pistols and parts for AK-47 assault rifles. (*See* Trial Transcript ("Tr.") at 541-44). Within an hour of Chokr's inquiry, Pouryan forwarded the request to Orbach, who immediately began to reach out to his contacts in the weapons trafficking business to source the requested items. (*Id*. at 544-47). Through a series of e-mail communications with weapons brokers, Orbach obtained offers from suppliers to provide the weapons that the client sought. (*Id*. at 548-550; 556-70). The deal, however, was temporarily put on hold.

Similarly, in September 2010, Pouryan received a request for weapons from a contact in the Sudan. (*Id*. at 570-72). As before, Pouryan turned to Orbach to find a supplier to fulfill the request. (*Id*. at 573-75). Orbach did just that. He again contacted individuals with access to weapons and obtained an offer from a supplier to provide grenade launchers, shotguns, training pistols, and grenades. (*Id*. at 582-89).

B. **The Taliban Weapons Deal**

In the fall of 2010, in the course of an investigation in West Africa focused on narcotics trafficking, confidential sources working for the Drug Enforcement Administration (DEA) and posing as Taliban representatives (collectively, the "Confidential Sources") asked co-defendant Maroun Saade to put them in touch with individuals who could supply weapons for the Taliban. (Tr. at 284-85). In November 2010, in Accra, Ghana, Saade introduced the Confidential Sources

to Pouryan as someone who could supply weapons.  (Government Exhibit ("GX") 101-T).  During the meeting, Pouryan and the confidential source known as "Yianni," who purported to be a Taliban financier, discussed the Taliban's need to modernize its arsenal and to obtain surface-to-air missiles to protect its heroin laboratories in Afghanistan.  (Tr. at 291, 589-98).  Pouryan confirmed that he had the ability to supply these kinds of weapons and agreed to continue the negotiations with Yianni.  (*Id*.).  Notably, Pouryan promised to maintain confidentiality in his dealings and emphasized that he was not interested in knowing who Yianni's clients were because he was just "selling something to some guy."  (*Id*.).  To Pouryan, the transaction was just a business deal, and the identity of the customer was not as important as getting the deal done.

Following the meeting in Ghana, Pouryan contacted Orbach to inform him that he had a new potential client for their weapons business.  (*Id*. at 599-600).  Specifically, Pouryan advised Orbach that the client was looking for, among other things, automatic weapons, anti-aircraft missiles and anti-tank missiles.  (*Id*. 600-03).  Orbach immediately went to work pricing the weapons, while Pouryan continued the negotiations with Yianni.  (*Id*. at 603-05).  In the meantime, Pouryan and Yianni maintained communications with each other via e-mail and telephone to set up a second set of meetings in Kiev, Ukraine to further the negotiations for the weapons deal.  (*Id*. at 606-10).  By December 4, 2010, Orbach had prepared a detailed price list for the weapons that the Taliban requested.  (*Id*. at 610-12).

In early December 2010, in Kiev, Pouryan attended two meetings with Yianni and another Confidential Source.  At the second meeting, on December 10th, Pouryan explained his method of doing business.  Again, he emphasized that discretion and secrecy are his hallmarks.  Pouryan also explained that he had a partner who would in the future explain to Yianni the

4

financing for the transaction, and the methods of delivery of the weapons. At the meeting, the Confidential Sources explained, and Pouryan understood, that the weapons would be used by the Taliban against American soldiers in Afghanistan. (*Id*. at 616-19).

Following the meeting, at Pouryan's suggestion, Pouryan and Yianni maintained contact via draft e-mails to avoid leaving a trail of incriminating communications. The communications from Pouryan were actually drafted by Orbach, who was more knowledgeable about weapons prices, and then placed in a draft e-mail folder for Yianni to review. For example, on December 17, 2010, Orbach sent Pouryan a memo entitled "Memo Systems cost December 17." (*Id*. at 626-28). The memo listed the weapons requested by Yianni for the Taliban and a host of associated military hardware, including Stinger anti-aircraft missiles, Javelin missiles, M47 Dragon anti-tank missiles, handguns and 40 mm grenade launchers. The total price for the order was over $12,000,000, and with a commission of 5.75%, Pouryan and Orbach stood to make over $700,000. (*Id*.).

Before meeting with Yianni again, Pouryan and Orbach worked on budgeting for the Taliban weapons deal, which was one of several deals that they had in the pipeline for a security and weapons trafficking business that they were developing. An internal budget document that Orbach drafted and provided to Pouryan projected that the Taliban deal would generate revenue for their business and help them recover their personal investments in the company. (*Id*. at 633-36; GX 230-A). As Pouryan and Orbach sought to grow and finance their business, the embargoed African nation deal from the spring of 2010 re-entered the picture. (*Id*. at 637-42). The client was still in the market for weapons, so Orbach and Pouryan sought to execute the deal to provide a package of weapons that was worth $30,000,000. (*Id*.)

With the Taliban deal in the works, and the embargoed African nation deal back in the picture, Orbach reached out to weapons suppliers to fulfill his clients' needs. For example, Orbach emailed a Russian arms production company, Izhmash, regarding AK-47 assault rifles, "specialty equipment," and ammunition. (*Id*. 644-45; GX 235). Orbach also e-mailed a contact associated with a private security firm based in the Dominican Republic, in an effort to locate weapons that could be purchased. (Tr. at 656-57; GX 243; GX 307-C; GX 307-C-aa-1 to 12). Orbach's e-mail attached a document entitled, "Memo Shopping List," which contained a list of military grade weapons that Yianni, the purported Taliban financier, had asked Pouryan for, including 50 caliber rifles, Night vision goggles, M16s, Glock handguns, and 40 mm grenade launchers. (*Id*.). The list also included the types of weapons that the embargoed African nation was trying to procure through Orbach and Pouryan. (*Id*.).

In a draft e-mail that Pouryan and Orbach left for Yianni, on January 23, 2011, Pouryan and Orbach "officially confirmed" an early February meeting in Bucharest, Romania with Yianni. (Tr. at 655; GX 242 and 508). In the e-mail, they assured Yianni that the newer Javelin missiles could be available for purchase but that they did not want to discuss the issue over e-mail.[1] (*Id*.)

The final meetings on the Taliban weapons deal took place in a hotel room in Bucharest, Romania on February 9 and February 10, 2011. (GX 104-T). Yianni and Pouryan were joined by Orbach. Yianni explained that he wanted the weapons delivered to the port of Constanta, Romania and described the need for the Taliban to receive training on the new weaponry. (Tr. at 664-68). Orbach represented that he and Pouryan could "fix" the Taliban's problem through a

---

[1] The parties agreed at trial, via stipulation, that "Javelin" can refer to a United States-designed, portable anti-tank missile, or a British-designed, portable, heat-seeking, surface-to-air missile, and that later-developed models of the British-made Javelin surface-to-air missile were called the "Starburst" and the "Starstreak." (GX 1007).

6

training program.  (*Id*. at 668).   The defendants further discussed their ability to sell the Taliban Javelin anti-aircraft missiles and the difference in price between the anti-tank Javelin missile and the anti-aircraft Javelin missile.  (*Id*. at 670-72).  The defendants and Yianni also discussed a payment mechanism.  Orbach described his system for discrete cash payments in Europe which would avoid the need for wires that could be traced to the defendants.  (Tr. at 683-88; GX 104-T at 52).  The deal was set.  Yianni made clear that the Taliban would pay for the weapons from its heroin sales.  (GX 104-T at 57).  Finally, it was agreed that at a meeting the next day, Yianni would provide a cash payment to the defendants.  (Tr. at 687; GX 104-T at 65).

In between the first and second meetings in Bucharest, Orbach and Pouryan continued to take steps to execute the deal with Yianni.  Orbach sent Pouryan an e-mail attaching an updated list of weapons and ammunition for Yianni, along with a detailed payment schedule.  (Tr. at 691-92; 294-95; GX 250; GX 251).  In total, the cost of the weapons sought by the Taliban was $25,000,000.  (*Id*.).  Orbach also provided Pouryan with information about the port of Constanta as a viable location for the delivery of the Taliban's weapons, just as Yianni had asked.  (Tr. at 692-93; GX 301-J).

The following day, on February 10, 2011, Pouryan and Orbach again met with Yianni at the Bucharest City Hotel.  (GX 105-T).  Orbach confirmed the date of the first delivery of the weapons, and discussed with Yianni the details of the weapons training package that Orbach and Pouryan would provide for the Taliban.  (GX 105-T at 12-13).  Orbach and Pouryan explained that they added a component part – a camera – for the Javelin missile system to the weapons list, "increasing" the total price of the deal.  (GX 105-T at 22-23).  Orbach also provided Yianni with a breakdown of the ammunition list and a proposed payment schedule.  (GX 105-T at 28-32). Finally, Yianni advised Pouryan and Orbach that, as he promised them the day before, he would

be giving them 250,000 Euros after the meeting. (GX 105-T at 41-43). In fact, at the end of the meeting, Pouryan and Orbach were arrested.

### III. POURYAN'S TRIAL TESTIMONY

Pouryan testified in his own defense at trial. Pouryan did not deny that he participated in the various meetings, email correspondence, telephone calls and Skype communications presented at trial, wherein he negotiated a weapons transaction with individuals who purported to represent the Taliban. Pouryan claimed, however, that he had no intent to consummate the transaction and that he was not a weapons trafficker. Rather, he claimed that he participated in the negotiations solely to gather information that he intended to pass along to the United States Government. Further, Pouryan claimed that he had extensive experience conducting such investigative activities, dating back to at least 2008, when he was tasked to work on a sensitive investigation on behalf of the Iraqi Anti-Terrorist Division. As the Court concluded, Pouryan's testimony was "fanciful, constantly shifting, and illogical." (Tr. at 1266). Despite Pouryan's claimed intent to inform U.S. authorities about the Taliban weapons deal, Pouryan never made any real effort to convey information concerning the weapons transaction to anyone in the United States Government, despite Pouryan's extensive government contacts. Pouryan also made no effort to record the information he was allegedly gathering, and made no reasonable attempts to determine the identity of the potential weapons suppliers, which Pouryan claimed was one of the purported goals of his "investigation." Pouryan did the opposite. At various points, he made concerted efforts to hide his activities by the using draft e-mails and changing his telephone numbers and the e-mail addresses he used in connection with the weapons transaction.

In sum, as the Court found, Pouryan's testimony was simply not credible. (Tr. at 1265).

#### IV.     THE PRESENTENCE INVESTIGATIVE REPORT

The Probation Office issued its Presentence Investigation Report ("PSR") in this case on August 22, 2013.  In the PSR, the Probation Office calculated an offense level of 45, a Criminal History Category of I, and a resulting applicable Guidelines range of life imprisonment.  Notably, the Probation Office did not apply obstruction points for Pouryan's testimony but left that to the discretion of the Court.  The Probation Office recommends a sentence of twenty-five years, the mandatory minimum for the missile trafficking offense.

#### V.     ARGUMENT

The offense conduct in this case is gravely serious -- providing material support to the Taliban through the provision of deadly weapons and training and conspiring to sell the Taliban surface-to-air missiles with knowledge that the missiles would be used to kill Americans in Afghanistan.  The conduct plainly calls for a lengthy sentence.  In addition, Pouryan's brazenly false trial testimony is deserving of a two-level enhancement under Section 3C1.1 of the Guidelines.   Although the two-point obstruction enhancement will not impact the Guidelines range, the obstructive conduct should be factored into the determination of the defendant's sentence.

#### A.     **Applicable Sentencing Law**

The United States Sentencing Guidelines (the "Guidelines") still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. at 264.  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines

range" — that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 50 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7).  *See Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6.  Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are

advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 522 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

**B.    The Nature, Circumstances, and Seriousness of the Offense Necessitate a Significant Sentence**

The nature and circumstances of Pouryan's offenses are remarkable, and the seriousness of his crimes cannot be overstated. As such, his conduct in this case warrants a lengthy prison sentence.

It is of course a serious crime to provide weapons of any type, and in any quantity, to individuals who intend to use them in connection with acts of violence. Pouryan's crime is especially serious. Pouryan agreed to sell large quantities of lethal military-grade weaponry, including anti-tank and surface-to-air missiles, and did so believing that the weapons would end up in the hands of the Taliban, and would be used to kill American soldiers in Afghanistan. These weapons are capable of inflicting devastating injury and loss of life. And there can be no doubt that Pouryan knew exactly who was purchasing the weapons and what they would be used for, as it was explicitly discussed at the in-person meetings with the Confidential Sources. Indeed, Pouryan offered advice on the types of weapons that would be most useful in different terrains, and agreed to provide training in the use of the weapons so that the Taliban could

employ them to their maximum destructive effect.  Pouryan's willingness to provide military-grade weapons to an organization that has engaged in acts of terrorism is simply chilling.

Furthermore, this was not Pouryan's first weapons deal.  Just a few months before the Taliban weapons deal, Pouryan worked to provide firearms to an embargoed West African country and to the Sudan.  In fact, the evidence at trial established that at the time the Taliban deal arose, Pouryan and Orbach, as well as Pouryan's father-in-law, Chokr, were in the process of forming a fledgling security services business called "Kit and Boodle."  Consistent with Pouryan's approach to the prior weapons deals, Pouryan treated the Taliban deal as a business venture.  He and Orbach drew up pricing lists and spreadsheets that broke down in detail the costs of the weapons and the profit that they expected to make from the transaction.  Orbach also drafted operating budgets for their various other business projects, which showed that they needed the Taliban deal to succeed in order to keep them financially afloat.  In short, they viewed the Taliban deal as a chance to make hundreds of thousands of dollars and save their floundering businesses – without regard to the potential loss of American lives.

Pouryan's conduct is shocking and merits a lengthy prison sentence.   Defense counsel's argument that Pouryan's personal characteristics -- primarily the emotional harm he suffered from being raised amongst political and military strife and mass killings in Iran and Iraq -- warrant a significant downward variance, is unavailing.  (*See* Deft. Sent Ltr. at 4).  Pouryan's personal background makes his conduct even more disturbing, especially when considered against the backdrop of his prior work as a translator for the U.S. Army.  In agreeing to provide weapons to the Taliban for use against U.S. soldiers, Pouryan willfully betrayed those who trusted him in the field of battle and was prepared to endanger the lives of members of the U.S. military.  This demands serious punishment.

**C.     The Defendant Should Receive a Two-Point Enhancement for Obstruction of Justice**

The Government respectfully submits that the defendant's materially false testimony under oath at trial should result in a two-level increase in the defendant's offense level pursuant to U.S.S.G. § 3C1.1.  Section 3C1.1 provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.

As the Supreme Court has explained, an enhancement for obstruction of justice is appropriate when a defendant "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *United States* v. *Dunnigan*, 507 U.S. 87, 94 (1993).  Thus, the Second Circuit held in *United States* v. *Zagari*, 111 F.3d 307 (2d Cir. 1997), that before applying an obstruction enhancement based on providing false testimony, the sentencing court must find by a preponderance of the evidence "that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *Id.* at 329.  In other words, "[b]efore imposing the adjustment, the district court must find that the defendant 'consciously act[ed] with the purpose of obstructing justice.'" *United States* v. *Lincecum*, 220 F.3d 77, 80 (2d Cir. 2000) (quoting *United States* v. *Case*, 180 F.3d 464, 467 (2d Cir. 1999)).  The Court must find each of the elements to be present by a preponderance of the evidence.  *See United States* v. *Salim,* 549 F.3d 67, 75 (2d Cir. 2008).

Several courts in this Circuit and in this District have applied the obstruction-of-

13

justice enhancement under circumstances similar to those presented in this case. *See*, *e.g.*, *United States* v. *Berry*, No. 01-1071, 2002 WL 480559 (2d Cir. 2002) (upholding enhancement for obstruction of justice following defendant's false trial testimony because "[t]he version of events recited by Berry while under oath is fundamentally inconsistent with the government's evidence and with the guilty verdict, leading inexorably to the conclusion that Berry gave materially false testimony.  Moreover, the extensiveness of the contradictions between Berry's testimony and the government's evidence supports the District Court's finding that Berry intended to give false testimony, and did not do so merely as a result of confusion or faulty memory."); *United States* v. *Stewart*, 686 F.3d 156, 174-78 (2d Cir. 2012) (imposing obstruction enhancement for defendant who provided false testimony at trial); *United States* v. *Foster*, 01 Cr. 450 (NRB), 2005 WL 3434641 (S.D.N.Y. Dec. 13, 2005) (on remand following *Booker* and *Crosby*, applying two-level obstruction of justice enhancement for defendant who testified falsely at trial about material issues, including gang affiliation).

     As the Court acknowledged, the key issue at trial – and the subject of Pouryan's testimony – was whether Pouryan intended to commit the charged crimes.  (Tr. at 1265).  After evaluating Pouryan's testimony in light of the other evidence presented at trial, the Court found that Pouryan's testimony on that key issue was patently false.  Accordingly, there can be no question that the two-level enhancement for obstruction of justice is appropriate in this case. While the additional two offense level points would not have any effect on Pouryan's Guidelines range, it is not purely symbolic because his perjurious testimony is a factor that should be considered at sentencing.

## VI. CONCLUSION

For the reasons set forth above, the Court should apply a two-level enhancement to Pouryan's Guidelines level for obstruction of justice and impose a sentence that reflects the nature, circumstances, and seriousness of his criminal conduct.

Dated:    New York, New York
          September 21, 2013

> Respectfully submitted,
>
> PREET BHARARA
> United States Attorney for the
> Southern District of New York
> Attorney for the United States of America
>
>
> By:      /s/
>          Christian Everdell / Aimee Hector
>          Glen A. Kopp
>          Assistant United States Attorneys
>          Tel.:  (212) 637-2556/2203/2210

**Affirmation of Service**

    GLEN A. KOPP, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury, that he is employed as an Assistant U.S. Attorney in the Southern District of New York, and that, on September 21, 2013, he caused copies of The Government's Sentencing Memorandum for Alwar Pouryan to be served via electronic notification and email:

> Lee Ginsberg, Esq.
> Freeman, Nooter, & Ginsberg
> 75 Maiden Lane, Suite 503
> New York, NY 10038

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  New York, New York
          September 21, 2013

> /s/
> GLEN A. KOPP
> Assistant United States Attorney